```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                           EASTERN DIVISION


LINDEL R. MAHAN,                 )
                                 )
          Plaintiff,             )
                                 )
     v.                          )    No. 4:09 CV 292 DDN
                                 )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
          Defendant.             )
```

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Lindel R. Mahan for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8.) For the reasons set forth below, the undersigned reverses and remands the decision of the ALJ.

## I. BACKGROUND

On December 1, 2005, plaintiff Lindel R. Mahan filed an application for disability insurance benefits under the Act, alleging an onset date of disability of November 14, 2005. (Tr. 140-45.) Plaintiff alleged disability due to diabetes, congestive heart failure, high blood pressure, arthritis, and impaired hearing. (Tr. 158.) His claim was denied, and he requested a hearing before an Administrative Law Judge (ALJ).[1] (Tr. 94.)

On January 15, 2008, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 16-70.) On December 24, 2008, the Appeals

---

[1]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 404.966 (2007). These modifications include, among other things, the elimination of the reconsideration step. See id.

Council denied his request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND EMPLOYMENT HISTORY

Plaintiff was born on July 3, 1948. He is six feet tall and weighs over 232 pounds. The Department of the Veterans Affairs (VA) certified that plaintiff was honorably separated from the Armed Forces and is a 100% service-connected disabled veteran. (Tr. 146.)

The record evidence shows consistent wage earnings from 1965 to 2005, with a significant drop in income in 2006. (Tr. 147-149.) Specifically, from July 1991 to November 2005, plaintiff worked as an electronic imaging technician, using a computer to make printing plates for presses. (Tr. 159.) In that position he was required to walk for ½ hour to one hour, stand for ½ hour to one hour, sit for seven hours, with no climbing, kneeling, crouching, or crawling. The record indicates there may have been some stooping required for about ½ hour per day. (Tr. 192.) He did not handle, grab, or grasp big objects. Reaching was required for part of the day. (Tr. 192.) Plaintiff was required to write, type or handle small objects for six to eight hours. He was not required to lift or carry anything. The heaviest weight lifted frequently was less than 10 pounds. (Tr. 159, 192, 200.)

From January 1966 to June 2001, plaintiff worked as a pre-press technician. In that position he worked as a supervisor and lead worker, where he prioritized the jobs and delegated them to the technicians. (Tr. 191.) He walked around the plant assisting eight technicians, answering questions, troubleshooting and reviewing their work. He walked for about three and ½ hours, stood for four hours, sat, climbed and stooped for ½ hour each day, never kneeling, or crawling. He would handle, grab or grasp big objects for ½ hour, and reach for two hours but not very often. He was required to write, type, or handle small objects for four hours per day. He carried printing plates and printing supplies, with the heaviest weight being 80 pounds to less than 10 pounds frequently. (Tr. 193, 201.)

On December 8, 2005, during the initial application process, H. Adams, the state agency interviewer, observed that plaintiff asked

several times for questions to be repeated because he could not hear well and "kept yawning like he was exhausted." (Tr. 155-156.)

A Disability Report completed by plaintiff states he was having difficulty caring for his personal needs, requiring him to move more slowly to avoid increasing pain. The report stated that he was unable to maintain his balance and needed to sit in the shower because it was difficult bending over to wash his lower extremities and maintain his balance. He was unable to put on his socks because his feet would not bend. He was no longer able to do housework because he is not able to stand long enough to do the dishes, vacuum or sweep because of pain. He was able to drive only short distances because he cannot sit in one position and needs to reposition himself. He is unable to grocery shop because he cannot walk up and down the aisles. He was easily fatigued, required a nap every afternoon, and found it more difficult to function when he had insufficient sleep. (Tr. 179-186.)

A Function Report completed by plaintiff on December 20, 2005 states that he uses the restroom constantly. He forgets or sleeps through insulin shots and other medications, and is on a diabetic diet. He leaves his home for medical appointments only. (Tr. 169, 170.) He must reread instructions because his attention span is about ten minutes. (Tr. 169.) He is able to walk 100 yards before he needs to rest to catch his breath, and cannot do yard work. (Tr. 169, 171.) He does not handle stress well, resulting in elevated blood pressure and blood sugar levels. He has problems getting along with family and friends. (Tr. 166-173.)

From February 25, 2003 to November 10, 2005, plaintiff was treated by Kenneth B. Smith, M.D., an internist. (Tr. 210-236.) On October 5, 2005, he was seen for his type 2 diabetes mellitus with diabetic nephropathy[2] and diabetic neuropathy[3], hypertension with chronic renal

---

[2]Nephropathy is any disease of the kidney. Stedman's Medical Dictionary 1291 (28th ed. 2006).

[3]Neuropathy is any disorder, often toxic, of the neuron. Id. at 1313.

-3-

failure, hyperlipoproteinemia[4] and thrombocytosis.[5] (Tr. 220.) Plaintiff's blood pressure was elevated at 158/70. (Tr. 221.) On a follow up visit November 10, 2005, he showed some improvement. Dr. Smith increased his Labetalol, a medication used to treat high blood pressure. (Tr. 220.)

On November 22, 2005, plaintiff was seen at the VA for a vision exam, complaining of flashes of light or floaters for two to three months. He was diagnosed with macular degeneration and background diabetic retinopathy. (Tr. 237-239, 246.)

On December 15, 2005, the record lists, among other things, active problems as hypertension, degenerative joint disease, diabetes mellitus Type 2, background diabetic retinopathy, macular degeneration, regular astigmatism, Presbyopia[6]; and shoulder pain. (Tr. 294-295, 308-309.) His medications included Pelodipine, for high blood pressure; Gemfibrozil, for cholesterol; hydrochlorothiazide, a water pill; and insulin, Lisinopril, Metpormin, and rosiglitazone, all for diabetes. (Tr. 295, 309.) Plaintiff had a slightly elevated blood pressure reading of 146/67. (Tr. 296, 297, 310, 311.)

On January 17, 2006, plaintiff was seen for follow-up on his diabetes. He was overweight at 238 pounds and his diabetes was not adequately controlled. (Tr. 300, 312.) His insulin had been increased the past October and his blood pressure was at the upper limits of normal resulting in an increase dosage of Labetalol. His insulin regimen would be modified. (Tr. 300-313)

On March 14, 2006, plaintiff was seen for follow-up. He complained of crying spells and of low back pain radiating to the left leg which had worsened over the past two months. (Tr. 292.) He indicated a history of falling down landing on his back two years ago. (Tr. 292, 306.) He ambulated with some difficulty. (Tr. 293.) He was assessed with

---

[4]Hyperlipoproteinemia is an increase in the lipoprotein concentration of the blood. Id. at 922.

[5]Thrombocytosis is an increase in the number of platelets in the circulating blood. Id. at 1984.

[6]Presbyopia is the physiological loss of accommodation in the eyes in advancing age. Id. at 1556.

-4-

depression and possible Post Traumatic Stress Disorder, and a mental evaluation with Behavioral Health Services was recommended. (Tr. 294.) His blood pressure reading was 140/60, and his weight was 242.7 pounds. (Tr. 293.)

On April 6, 2006, a Behavioral Health Services mental evaluation was performed at the VA. (Tr. 298-299.) Plaintiff complained of experiencing depressed moods marked by crying spells associated with difficulties coping with the death of his mother two years ago. He expressed interest in individual counseling. (Tr. 298-299.) He was assessed with a chronic adjustment disorder with depressed mood. He had no complaints of pain and was assigned a GAF score of 59, which characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or coworkers).[7] (Tr. 299.)

A note signed by Kenneth Beckersmith, M.D. dated May 12, 2006, states, "Due to medical illness, this patient is unable to sit at a desk for prolonged periods of time. He develops leg paresthesias."[8] (Tr. 302, 314.)

On July 27, 2007, plaintiff was seen for follow-up at the VA hospital with complaints of back pain for the past two months. He had fallen down a couple of times, the last time being two weeks earlier. He also complained of numbness in the left lower leg. (Tr. 323.) Upon examination, he ambulated with difficulty. He was assessed with lower back pain, given a steroid pack, and instructed to take over-the-counter Motrin and to follow-up if his symptoms did not improve. (Tr. 324-25.)

**Testimony at the Hearing**

On August 10, 2007, a hearing was conducted before an ALJ. (Tr. 16-70.) Plaintiff testified that he had fourteen years of formal

---

[7] Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

[8] Paresthesias is a spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous system. Stedman's at 1425.

education and took business and air conditioning refrigeration classes while attending a junior college. (Tr. 24.) He last worked for about five years as an electronic imaging technician, where he put book covers together on the computer and made plates for printing press. (Tr. 24.) He testified this job was performed in a seated position for about 90% of the time with very little time required in a standing position. (Tr. 25.) The job required loading the machines and lifting 50 to 70 pounds, using his hands to type, and setting up the machines by inserting film and paper. (Tr. 25.) Plaintiff testified that he stopped working in November 2005 because the company relocated to Chicago. (Tr. 28.) Plaintiff also worked for three years as a lead worker performing the same duties, and for one year in a supervisory capacity. (Tr. 26.)

Plaintiff testified he also worked as a pre-press technician for approximately ten years in Missouri and 25 years in Illinois. (Tr. 26.) In this position he was required to lay up film manually to be burnt on plates for the printing press. (Tr. 26.)

Plaintiff testified he had been disabled since November 14, 2005, at which time he felt he could no longer work. (Tr. 28.) He testified that his last employer had accommodated him by allowing him to get up and move around when his legs and buttocks started to get numb. (Tr. 29.)

Plaintiff testified he served in Vietnam from 1968 to 1970. (Tr. 30.) He testified he was rendered disabled by the VA about ten years ago because of an accident there. While driving a truck hauling Agent Orange, one of the barrels broke, soaking him and causing the skin on his face to peel off. (Tr. 30.) He testified that he receives a monthly pension of $2,610.00, as well as medical treatment from the VA, because he does not have health insurance. (Tr. 44.)

Plaintiff testified he was diagnosed with diabetes about twelve to thirteen years ago; that he was currently having difficulty keeping it under control; and that he was on insulin and a special diet. (Tr. 31.) He testified he has nerve damage or neuropathy affecting his buttocks, legs, feet, and hands, and that he has pain, numbness, and tingling in his hands. (Tr. 31-32.) The pain in his arms and hands is intermittent, resulting in difficulty grasping doorknobs, opening jars, and picking up coins. (Tr. 32-33.) He testified that when he lays down on his side his

hands feel like they are going to sleep. (Tr. 32.) He does not use the computer at home. (Tr. 33.) He could not recall all of his medications, although he takes eleven pills in the morning and six at night. (Tr. 35.)

Plaintiff testified he has continuous pain in his back and legs which is aggravated by walking and sitting. (Tr. 32.) He stated he was uncomfortable sitting at the hearing. (Id.)

Plaintiff testified that his back pain began about five or six years ago; that the pain was located in the center of his back; that he was unable to bend or squat; and that he takes Darvon and Cortisone for his pain. (Tr. 33-34.)

Plaintiff testified he has pain from arthritis in his arms, knees, ankles, elbows, and shoulders for which x-rays had been taken. (Tr. 35.) He testified he has been treated for diabetic retinopathy and has been advised that laser surgery will eventually be needed. (Tr. 35-36.) He wears glasses and can read a newspaper, but has difficulty reading small print. (Tr. 36.) He has a driver's licenses, but does not drive because he does not think it is safe. (Tr. 36, 41.) He testified he has trouble with falling and uses a cane to brace himself. (Tr. 37.)

Plaintiff testified that he could probably lift 10 to 15 pounds and was unsure if he could carry objects for any distance. (Tr. 38.) He thought he could sit for about 20-25 minutes before he needed to alternate positions and could sit for three hours with the option to move around. (Tr. 38-39.) He testified he could stand for about fifteen minutes and usually falls if he stands for longer. (Tr. 39.) He has difficulty squatting, bending, going up stairs, and dressing, and uses a stool to sit in the shower. (Tr. 39-40.) He can no longer do yard work because of difficulty standing and bending. (Tr. 40-41.)

Plaintiff described a typical day as getting up between 7:30 and 8:00 a.m., taking a shower and shaving, sitting for about thirty minutes to an hour, laying on the couch and watching television or falling asleep until dinner or lunch, getting up and eating, then back to the couch until supper, watching television and retiring to bed. He lays on the couch because it is more comfortable and provides relief for his legs. (Tr. 41-42.) He reads the newspaper and books. (Tr. 42.) His life has

changed because he used to be active, playing basketball, baseball and softball, along with hunting, fishing and skiing. (Tr. 42.)

Plaintiff testified that he was in pain during the hearing, specifically in his buttocks and the center of his back about three inches above his belt. (Tr. 43.) He rated his pain level at 6 or 7 on a ten-point scale and stood up during the hearing to get some relief. (Tr. 43-44.)

When asked by the ALJ whether he would be able to return to his former job with the accommodations his last employer had provided him because his condition had worsened, plaintiff testified that he could not have worked much longer before he would have had to resign. (Tr. 45.) He testified that he did not believe there was any work that he could do. (Tr. 49.) Plaintiff testified that he had been using a cane for two years on the advice of his doctors. (Tr. 50.)

Charlene Mahan, plaintiff's wife of 39 years, testified at the hearing. (Tr. 52-53.) She testified that she quit her job as a real estate agent in March 2007, due to her husband falling down and not eating. She testified that he had fallen a couple of times between the bedroom and the bathroom and had been badly bruised. (Tr. 53.) Ms. Mahan testified that her husband slept constantly when he worked the third shift because his blood sugar was uncontrollable, and that his doctors explained the difficulty for a diabetic to working the third shift. (Tr. 54.) Despite instructions from a specialist on diabetes management, plaintiff's blood sugar was not completely controlled. (Tr. 54.) Ms. Mahan testified that her husband was not aware of the great amount of time he spent sleeping, that it had been the case for at least a year before he quit working, and that it is still problem. (Tr. 54-55.) She testified that he falls asleep on the couch by 10:00 a.m. and sleeps at least five hours between 8:00 a.m. and 5:00 p.m. (Tr. 55-56.)

Ms. Mahan stated the VA doctors had spoken to her husband about quitting work because his sugar levels were fluctuating greatly. (Tr. 56.) She stated that although his sugar levels had been controlled over the past six months, she believed that when he stopped working in November 2005 he could not have continued working full-time. (Tr.

56-57.)  She testified that not being able to work weighs heavily on her husband since he has always been a strong man and was now depressed and needed treatment.  (Tr. 57-58.)  She testified that their adult children have also noticed how difficult it is for him mentally.  She testified that because of his medications he is unable to have sexual relations, which also bothers him; that their lives have changed completely, because family and others have always depended on him; and that he enjoys seeing his family and friends, but is unable to do so due to fatigue.  (Tr. 58.)

Medical Expert Testimony

Dr. Morris Alex, M.D., a medical expert, testified telephonically after reviewing the medical evidence and hearing plaintiff's testimony.  Dr. Morris testified that plaintiff's impairments did not equal any of the listings for ischemic heart disease or hypertension because there was no evidence of end organ disease, no evidence of acidosis, and no evidence of retinitis proliference.  He found plaintiff's impairment of obesity met the listing at level one, and was mild for neuropathy and Kimmelstiel-Wilson syndrome.[9]  (Tr. 61-62.)  Dr. Alex could not give a valid evaluation for his arthritis or back discomfort.  He testified there was nothing in the record about Agent Orange causing plaintiff's neuropathy.  (Tr. 63.)

Dr. Alex testified that it would be important to get information from plaintiff's treating sources, i.e., his private primary care physician or from the VA, as to whether plaintiff's symptoms for arthritis, his back, Agent Orange, and depression or anxiety had been evaluated.  (Tr. 62-63.)  When asked by the ALJ whether the file was sufficient for him to offer an advisory residual functional capacity estimate as to what plaintiff could lift, Dr. Alex responded, "I would feel, I would feel that I could not give a valid evaluation" because more evidence was needed.  (Tr. 63-64.)

When questioned about the initial assessment completed by the state agency on January 19, 2006 finding plaintiff not medically qualified, Dr. Alex testified that the assessment was reasonable at that time based on

---

[9]Kimmelstiel-Wilson syndrome is a nephrotic syndrome and hypertension in patients with diabetes.  Stedmans at 559.

earlier submitted documents, but lacked plaintiff's testimony, his spouse's testimony, and the additional medical evidence that had been submitted. He testified that "there's something else going on and that needs to be evaluated." (Tr. 64.) He testified that plaintiff had a degree of neuropathy, and that an electromyogram would evaluate its severity and would be helpful to show the court if his symptoms had progressed. (Tr. 65-66.)

Vocational Expert Testimony

Vocational expert John F. McGowan testified at the hearing. He testified under the first hypothetical that if the plaintiff was deemed credible and had the symptoms he described to the court, as well as the statements of his wife corroborating plaintiff's need for rest periods, plaintiff would not be able to sustain any work activity. (Tr. 67.)

The second hypothetical assumed plaintiff was capable of performing at least sedentary work and could alternate his positions between sitting and standing; could not sit for more than 25 minutes before being allowed to stand, move about; could not stand for more than 15 minutes before being allowed to sit back down; could lift up to 10 pounds occasionally, smaller amounts more frequently; could never climb ladders, ropes, or scaffolding; could never engage in work where balancing was critical to the performance of his duties; could not more than occasionally bend, stoop, crouch; and could never crawl. Environmentally, plaintiff would need to avoid concentrated exposure to extreme hot and cold temperatures. He would need to avoid concentrated exposure to vibration of the body, walking on wet or uneven surfaces, and he could not engage in work where he had to be exposed to a hazardous work, or open moving machinery or unprotected heights. The VE testified that plaintiff could not return to any of his past work if he was limited in this fashion. (Tr. 67-68.)

The VE testified that within the same set of limitations, plaintiff had no transferable skills, considering plaintiff's age and the specialized nature of his past work. (Tr. 68.) The VE testified plaintiff could not perform sustained sedentary work because his sitting and standing periods were too short for standard gainful employment. (Tr. 68.) When asked by the ALJ whether plaintiff was capable of doing

sedentary type work, the VE testified, "not under that particular hypothetical." (Tr. 68.)

Plaintiff's non-attorney representative advised the ALJ that VA doctors are not allowed to respond to interrogatories or physical capacities. (Tr. 68-69.) The ALJ ordered the record to be held open for an additional 14 days to receive additional medical notes from the VA and to make a determination as to whether the record should be developed further. (Tr. 69.)

### III.  DECISION OF THE ALJ

On January 15, 2008, the ALJ issued an unfavorable decision. (Tr. 5-15.) The ALJ determined that plaintiff had the medically determinable impairments of diabetes mellitus and essential hypertension. (Tr. 10.) At Step Two, the ALJ found that plaintiff did not have an impairment or combination of impairments that significantly limited his ability to perform basic work related activities for twelve consecutive months, and therefore he did not have a severe impairment or combination of impairments under the Act. Thus, the ALJ determined that plaintiff was not disabled at Step Two of the sequential evaluation process. (Tr. 13.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically

determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d 935, 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW).  (Id.)  The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  Id.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

### V.  DISCUSSION

Plaintiff argues the ALJ erred in (1) failing to give appropriate weight to his subjective complaints of pain, specifically, failing to take into account the combined effects of all his impairments and how the combination would affect his ability to be employed in the national economy; (2) failing to follow the "slight abnormality" standard in finding his diabetic neuropathy was non-severe; (3) failing to recontact his medical provider; and (4) failing to make a finding supported by substantial evidence.

**A.   Step Two and the Slight Abnormality Standard**

The ALJ determined that plaintiff did not suffer from any severe impairments or combination of impairments that were of such severity as to limit his ability to perform basic work activities.  He concluded the

medical evidence establishes only slight abnormalities or a combination of slight abnormalities that would have no more than a minimal effect on his ability to work, ending the inquiry at Step Two of the five-step evaluation process.  (Tr. 12-13.)  This was error.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment.  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).  The claimant bears the burden of proving his impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant.  Id.; Dewald v. Astrue, 590 F. Supp.2d 1184, 1200 (D.S.D. 2008).  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ."  Kirby, 500 F.3d at 707; see also Germany-Johnson v. Comm'r of Soc. Sec., 313 F. App'x 771, 774 (6th Cir. 2008) (per curiam) (Step-Two severity review is used primarily to screen out totally groundless claims).  Social Security Ruling 85-28 states:

> Great care should be exercised in applying the not severe impairment concept.  If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step.  Rather, it should be continued.... [S]equential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

Social Security Ruling 85-28, quoted in Bowen v. Yuckert, 482 U.S. 137, 158, (O'Connor, J., concurring); see also Gilbert v. Apfel, 175 F.3d 602, 604-05 (8th Cir. 1999)(same).

In applying the second step of the sequential evaluation process, "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the evaluation process.  Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987) (quoting Bowen v. Yuckert, 482 U.S. 137, 158, (1987) (O'Connor, J., concurring)); see also Kirby, 500 F.3d at 707 (an impairment is not severe if it amounts to only a "slight abnormality" and does not significantly limit the claimant's

physical or mental ability to do basic work activities); 20 C.F.R. § 404.1521(a) (same).

Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id. The sequential evaluation process terminates at Step Two if the impairment has no more than a minimal effect on the claimant's ability to work. Kirby, 500 F.3d at 707.

Applying this standard in this case, the record evidence indicates plaintiff's impairments amount to more than a minimal limitation on his ability to perform basic work activities. Nothing in the record evidence contradicts plaintiff's assertion that he suffers from the afore-mentioned impairments, nor have any of his treating physicians ever documented plaintiff's complaints as unfounded. Plaintiff established medically determinable impairments of diabetes with neuropathy causing pain and fatigue. The record contains documented notes from his treating physician at the VA observing his abnormal gait, crying spells, and restrictions on lifting more than ten pounds. (Tr. 294.) Plaintiff uses a cane for balance. A note from Dr. Kenneth Smith states plaintiff is unable to sit at a desk for prolonged periods because he develops leg paresthesias. (Tr. 302, 314.) The VA assessment for depression showed a GAF score of 59. (Tr. 299.)

The ALJ's decision contradicted the medical expert's opinion that plaintiff's condition had progressed and should be further evaluated. Also, the VE's answers to the hypothetical questions are strong evidence that plaintiff's impairments are indeed severe.

Taken as a whole, the record evidence reveals that plaintiff had Type II diabetes mellitus, essential hypertension, obesity, back pain, and leg paresthesias. Even if partially discounted, this evidence indicates plaintiff's physical impairments would have more than a minimal

effect on his ability to work, and that his physical impairments were severe. See Kirby, 500 F.3d at 707. Accordingly, the court concludes that substantial evidence does not support the ALJ's decision to stop the sequential analysis of plaintiff's claim with a Step Two finding that he has no severe impairment.

**B.   Recontacting Plaintiff's Medical Provider**

Plaintiff next argues the ALJ erred in failing to recontact his treating physician based on the testimony of medical expert Dr. Morris Alex that he could not make an adequate assessment of the severity of plaintiff's medical condition without further information. This court agrees.

The ALJ has the duty to develop the record, which includes developing the record as to the medical opinion of the claimant's treating physician. Higgens v. Apfel, 136 F. Supp.2d 971, 978 (E.D. Mo. 2001) (citing Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987). The ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). The ALJ is not required, however, to contact the treating physician whenever the ALJ rejects that opinion. See Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006); see also 20 C.F.R. §§ 404.1512(e)-(d), 404.1527(c)(3); SSR 96-2p. While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).

Here, Dr. Alex testified that further information was needed to make a residual functional capacity (RFC) assessment. His testimony is consistent with the record as a whole, which demonstrates that plaintiff's condition had worsened. The record contains a note stating plaintiff needs a sit and stand option and is restricted to lifting ten pounds or less and demonstrates some functional limitations resulting from his impairments that would affect his ability to sustain full-time employment. The record evidence supports plaintiff's testimony regarding

lifting restrictions and the need for sit and stand options.  Moreover, plaintiff's subjective complaints were not contradicted by his level of daily activities.

In light of the evidence, at the very least, the ALJ should have contacted the treating physician for clarification.  20 C.F.R. § 404.1512(e) (requiring the ALJ to re-contact the claimant's treating physician or psychologist or other medical source where the information the SSA receives from that source is inadequate to determine whether the claimant is disabled).  See also 20 C.F.R. § 404.1527(c)(3)(regulations provide that "[i]f the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h.  We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information.")

On remand, the ALJ should more fully consider the record, and re-contact plaintiff's treating physician.

**C.    New Evidence**

Plaintiff also moves to supplement the record with documents from the VA, which include (1) July 22, 2002 radiology reports of the left foot and left hand; (2) March 27, 2006 and December 27, 2007 radiology reports of the lumbosacral and thoracic spine; (3) November 13, 2008 radiology reports of the right knee; and (4) August 10, 2008 correspondence from Roja Balakrishnan, M.D., plaintiff's primary care physician at the VA.

Plaintiff argues the new evidence is material to the consideration of the evidence, noting the first three exhibits are dated before the date of the ALJ's January 15, 2008 decision and before the December 24, 2008 denial of review by the Appeals Council.  He argues they are relevant to his medical conditions of arthritis, back and leg pain,

impairments that were previously unconsidered by the ALJ because of lack of documentation in the VA records. This court agrees.

A sentence six remand is authorized in only two limited situations: (1) where the Commissioner requests a remand before answering the complaint of a claimant seeking reversal of an administrative ruling, or (2) where new and material evidence is adduced that was for good cause not presented during the administrative proceedings. See 42 U.S.C. § 405(g); Shalala v. Schaefer, 509 U.S. 292, 297 n.2 (1993); Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993).

New evidence does not include cumulative evidence which would not have changed the ALJ's decision. Riley v. Shalala, 18 F.3d 619, 623 (8th Cir. 1994). Good cause for the failure to present the evidence previously may be shown by the fact that the subject evidence did not exist previously. Goad v. Shalala, 7 F.3d 1397, 1398 (8th Cir. 1993). Materiality, which is treated as a separate test under § 405(g), relates to the claimant's condition on or before the date of the ALJ's decision. Id. To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's decision. Id.

Following review of the evidence, the court concludes that the new evidence is material under § 405(g) because it may be probative of plaintiff's condition during the relevant time period. The court concludes the additional evidence also provides a basis for remand.

## VI.  CONCLUSION

For the reasons set forth above, the court reverses the final decision of the Commissioner of Social Security and remands the action under Sentence 4 of 42 U.S.C. § 405(g). On remand, the ALJ shall (1) reconsider the objective medical evidence, plaintiff's subjective complaints, plaintiff's testimony, and that of his witness; (2) recontact plaintiff's treating physicians; and (3) consider the supplemental records submitted by plaintiff.

An appropriate judgment order is issued herewith.

/S/   David D. Noce

**UNITED STATES MAGISTRATE JUDGE**

Signed on December 21, 2009.